FILED
2020 May-27  PM 02:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION

| | |
|---|---|
| MICHAEL RABURN, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| vs. | )   Case No.   6:19-cv-0838-HNJ |
| | ) |
| SOCIAL SECURITYADMINISTRATION, | ) |
| COMMISSIONER, | ) |
| | ) |
| Defendant | ) |

## MEMORANDUM OPINION

Plaintiff Michael Raburn seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding his claim for a period of disability and disability insurance benefits.  The undersigned carefully considered the record, and for the reasons expressed herein, **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.  The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment.

which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 404.1505(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at § 404.1520(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1, §§ 1.00-114.02. *Id.* at § 404.1520(d). If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525.

That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment.  *See Williams v. Astrue,* 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.") (citing 20 C.F.R. § 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work.  20 C.F.R. § 404.1520(e).  At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work.  *See id.* § 404.1520(a)(4)(iv).  If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled.  *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work.  20 C.F.R. § 404.1520(g).  If the claimant can perform other work, the evaluator will not find the claimant disabled.  *See id.* § 404.1520(a)(4)(v); *see also* 20 C.F.R. § 404.1520(g).  If the

3

claimant cannot perform other work, the evaluator will find the claimant disabled.  20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'"  *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).   The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards.  *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).   Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ.   *Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted).   "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."   *Id.* (citations omitted).   Nonetheless, substantial evidence exists even if the evidence preponderates against the Commissioner's decision.   *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Mr. Raburn, ages 46 and 47 at the time of the two ALJ hearings, protectively filed applications for a period of disability and disability insurance benefits on July 22, 2016,

alleging disability as of April 11, 2016. (Tr. 48, 83, 267). The Commissioner denied his claims, and Raburn timely filed a request for hearing on September 22, 2016. (Tr. 128-32, 134-35). An Administrative Law Judge ("ALJ") held two hearings, on May 25, 2017, and November 7, 2017. (Tr. 41-105). The ALJ issued an opinion on June 27, 2018, denying Raburn's claim. (Tr. 7-27).

Applying the five-step sequential process, the ALJ found at step one that Raburn did not engage in substantial gainful activity after April 11, 2016, his alleged onset date. (Tr. 12). At step two, the ALJ found Raburn had the severe impairments of bipolar depressive disorder and psoriatic arthritis. (*Id.*). At step three, the ALJ found that Raburn's impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 13).

Next, the ALJ found that Raburn exhibited the residual functional capacity ("RFC")

> to perform light work as defined in 20 CFR 404.1567(b) except: He can occasionally (up to one-third of an eight-hour workday) lift and or carry, including upward pulling of 20 pounds and frequently (up to two-thirds of an eight-hour workday) lift and/or carry, including upward pulling of 10 pounds. He can sit for six hours in an eight-hour workday with all customary work breaks. He can stand/and or walk for six hours in an eight-hour workday with all customary work breaks. He has no limitations in the ability to push and/or pull, including operation of hand or foot controls, up to the lift and carry restriction of twenty and ten pounds. He has no limitation in the upper or lower extremity except for the right upper extremity is limited to frequently for pushing/pulling but is limited in the right upper extremity to no overhead reaching and frequent pushing and pulling [sic]. He can occasionally climb ramps and stairs, but no work on ladders, ropes, or scaffolds. He cannot work around dangerous moving

5

machinery.   He cannot [perform] work that involves commercial driving. He can occasionally balance, stoop, kneel, and crouch, but no crawling.   He can frequently handle and finger bilaterally.   He cannot work in concentrated exposure to extreme cold.   He cannot have a vibratory type of job with vibrations involved.   He can remember and perform work at simple tasks for two-hour periods across an eight-hour workday, five-day workweek, with all customary breaks.   He can have occasional contact with supervisors, co-workers, and the general public.   Any changes in the work environment should be infrequent.

(Tr. 15-16).

At step four, the ALJ determined Raburn did not retain the ability to perform his past relevant work as a Fish and Game Warden.   (Tr. 25).   At step five, the ALJ determined Raburn could perform a significant number of other jobs in the national economy considering his age, education, work experience, and RFC.   (Tr. 26). Accordingly, the ALJ determined that Raburn has not suffered a disability, as defined by the Social Security Act, since April 11, 2016.   (Tr. 27).

Raburn timely requested review of the ALJ's decision.   (Tr. 260-63).   On April 16, 2019, the Appeals Council denied review, which deems the ALJ's decision as the Commissioner's final decision.   (Tr. 1-3).   On May 31, 2019, Raburn filed his complaint with the court seeking review of the ALJ's decision.   (Doc. 1).

## ANALYSIS

In this appeal, Raburn argues that the ALJ improperly considered the opinions of his treating physician and improperly evaluated his complaints of subjective symptoms.

6

For the reasons discussed below, the undersigned concludes neither of the contentions warrants reversal.

## I.     The ALJ Properly Considered the Treating Physician's Opinion

Raburn argues the ALJ improperly considered the opinions of Dr. Terry Bentley, his treating psychiatrist.   As discussed below, the ALJ properly relied upon the remainder of the record, including Dr. Bentley's own treatment notes, the records of other medical providers, and the testimony of medical expert Dr. Nathan Strahl, to reject Dr. Bentley's assessments.

The ALJ must give "substantial or considerable weight" to the opinion of a treating physician "unless 'good cause' is shown." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2003) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)).   Good cause exists when: (1) the evidence did not bolster the treating physician's opinion; (2) the evidence supported a contrary finding; or (3) a treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Id.*   An ALJ must clearly articulate the reasons for affording less weight to a treating physician's opinions. *Id.*   An ALJ does not commit reversible error when (1) he articulates specific reasons for declining to give the treating physician's opinion controlling weight, and (2) substantial evidence supports these findings. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005) (*per curiam*).

To determine the weight given to any medical opinion, an ALJ must consider several factors, including the examining relationship, the treatment relationship, the evidence

presented to support the opinion, the consistency of the opinion with other evidence, and the specialization of the medical professional.   20 C.F.R. §404.1527(c); *see Davis v. Comm'r of Soc. Sec.*, 449 F. App'x 828, 832 (11th Cir. 2011) (stating that the ALJ will give more weight to the medical opinions of a source who has examined the plaintiff and opinions that are supported by medical signs and findings and are consistent with the overall "record as a whole").   The ALJ may reject the opinion of any physician when the evidence supports a contrary conclusion.   *Hearn v. Comm'r of Soc. Sec.*, 619 F. App'x 892, 895 (11th Cir. 2015) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983)).

Dr. Bentley completed a Medical Source Opinion Form (Mental) on January 23, 2017.   He checked boxes indicating Raburn experienced moderate limitations of his abilities to use judgment in simple, one- or two-step work related decisions; understand, remember, and carry out simple, one- or two-step instructions; and maintain activities of daily living.   Raburn experienced marked limitations of his abilities to respond appropriately to supervisors, co-workers, customers, and other members of the general public; deal with changes in a routine work setting; understand, remember, and carry out detailed or complex instructions; respond to customary work pressures; maintain attention, concentration, or pace for periods of at least two hours; and maintain social functioning. Raburn retained the ability to manage benefits in his own best interest.   Ceasing alcohol consumption would not affect the extent of Raburn's limitations.   (Tr. 755-56).

On January 23, 2017, Dr. Bentley also provided a sworn statement, which took the form of his sworn verbal responses to questions from Raburn's attorney.  Dr. Bentley testified he had treated Raburn on seven occasions since May 18, 2016, for bipolar depressive disorder and anxiety.  Raburn reported erratic sleep, reduced need for sleep, racing thoughts that prevented him from focusing, excessive spending, an increase in his symptoms as the result of a pending divorce, and difficulties performing his work duties and interacting with coworkers.  Dr. Bentley treated him with mood stabilizers and other medications for bipolar disorder, which helped his mood, energy level, and manic symptoms.  However, Dr. Bentley noted that Raburn's symptoms also may have decreased because he was not working and therefore experienced less stress.  (Tr. 762-769).  Dr. Bentley opined that, despite his treatment, Raburn experienced "significant mental illness."  (Tr. 769).

Dr. Bentley clarified that, when he or a staff member notes on a chart that a patient is "doing good or fairly good,"

> those [notations] are relative for us, and I will say that sometimes the person that's marking the mental status, in terms of how his mood is doing, is my nurse, and often what they tell the nurse and what they then tell me when I come in is not the same thing.  But he, alone, with countless other patients, have said they would be doing good, but they've done well because they've removed themselves from pretty much all social interactions, be that work, interacting with friends, whoever.  With their anxiety and their depression, they're staying at home predominantly.  They may have an occasional trip or something and that will give them something to look forward to, which may help their mood, but for the most part, they're isolating themselves, and I believe that's what's happening with [Raburn].

(Tr. 769-70).

Dr. Bentley reaffirmed, but did not explicate, the summary opinions he offered on the Medical Source Opinion Form.   He did not believe Raburn malingered, and he offered an uncertain prognosis:  "It's fair, given the chronicity of the illness and the nature of bipolar disorder, you know, it may respond favorably to treatment for some time, but there's a likelihood it won't."   (Tr. 771).

On June 1, 2017, the ALJ sent Dr. Bentley a letter stating:

> At request of Mr. Raburn's attorney, you completed a "Mental Residual Functional Capacity Questionnaire"[2] signed and dated on January 23, 2017.  (Copy attached).  This form consisted of prepared questions with several responses for you to check from the definitions of the terms provided on this form.  This form also requested that you provide medical or clinical findings (i.e. mental status examinations, behavior, intelligence test, symptoms, etc.) which support your assessments or responses.  However, that portion of the form requesting "clinical findings" are [sic] all blank.  A review of your Deposition by Ms. Allison Jones on the same date, notes she asked you if your responses were based upon your knowledge, information, and belief, taking into account your experience, training, and your treatment of Mr. Raburn.  You responded, "They do."  However, again, no clinical findings are noted on either this form or your response.

> Enclosed are Interrogatories that we would appreciate your responding to within the next ten (10) days regarding the form you completed on January 23, 2017.   If there are additional records, please attach those records to your responses to these questions.

---

[2] As stated above, the form actually bore the title "Medical Source Opinion Form (Mental)."  (Tr. 755).

(Tr. 443).   The attached interrogatories requested explanations for each of the "marked"

limitations Dr. Bentley identified on the Medical Source Opinion Form, along with any

objective testing, subjective assessments, and medical records.   (Tr. 444-45).

On June 14, 2017, Dr. Bentley responded with a letter stating:

> I received your letter regarding the "Mental Residual Functional Capacity Questionnaire."   I apologize for taking a bit to reply but my practice is rather large and I haven't had an opportunity until now.

> In the quarter century I have been practicing, I have never done more than check the appropriate responses and have never given examples to the side and frankly had never noticed it.   All the information on the patient's chart is for my record keeping.   I generally do not recommend a patient file for disability unless they have been having trouble functioning in the workplace.   I do not, however, usually know the specifics of their job.

> In the matter of Michael Lynn Raburn, I have treated him for the last year for Bipolar Affective Disorder, also known as manic depression and an anxiety disorder.   I am well acquainted with his care.   Details are in these records.   I do not have the time to go back through and reevaluate what is there.

> According to Social Security regulations he has both Bipolar Disorder and Generalized Anxiety Disorder.   He has had impairment in performing both at the workplace and at home.   He was at risk of losing his job and had to medically retire.   He has had considerable social dysfunction and has been estranged from his wife and is now divorced.   He socially isolates.   He had been unable to interact appropriately with his supervisor at work.   He was a game warden and therefore was alone much of the time.   He has chronic severe mood and anxiety disorders that have responded to some degree to treatment but are persistent and have proven to deteriorate over time.

> Psychiatric evaluation and treatment involve assessments over time. He has been seen by me on 10 separate occasions and documentation is in the chart that was sent to the state regarding his functioning.   If that is not in the records you have available, I will make sure to get them to you.   At

this point in time, I do not anticipate him being able to function in any job
setting.

(Tr. 450).

The ALJ explained in the second administrative hearing, which occurred on
November 7, 2017, that he sent interrogatories to Dr. Bentley because he could not read
the doctor's office notes.   Because Dr. Bentley declined to respond to the interrogatories,
the ALJ engaged Dr. Nathan Strahl, a board-certified psychiatrist, to testify as a medical
expert during the second hearing.   (Tr. 44-45).

Dr. Strahl reviewed Raburn's psychiatric records and listened to Raburn's hearing
testimony.   He noted Raburn had received 12 to 16 months of treatment for bipolar
disorder, including a period of time when he experienced additional stress as a result of
relationship problems.   (Tr. 65, 70).   Dr. Strahl deduced that Raburn experienced a
"moderate level of clinical depression, bipolar disorder, whatever we want to call it,
uncontrolled.   That's not in disabling range, but isn't insignificant either."   (Tr. 66).   Dr.
Strahl acknowledged his review did not rise to the level of a clinical evaluation, but he
believed his observations of Raburn comported with the medical records and Raburn's
positive response to medication.   Dr. Strahl also opined Raburn suffered borderline
alcohol dependence until he quit drinking altogether in May 2017.   (Tr. 66-67).

Dr. Strahl concluded the restrictions Dr. Bentley imposed "seemed to exceed what
the record itself shows."   (Tr. 67).   Specifically, Dr. Strahl opined Raburn experienced
mild impairment in the ability to learn new tasks and deal with issues because the records

12

contained no indication of a cognitive or mental acuity impairment.   He experienced mild to moderate impairment in the ability to interact with others because his depression impeded his sociability.   Raburn experienced mild to moderate impairment in maintaining concentration, persistence, and pace, and mild impairment in adapting and managing himself.   Dr. Strahl testified that, "once [Raburn] gets started with things, he could pick up and do it okay," and he opined that boredom was causing Raburn some emotional problems.   (Tr. 68-69).   Raburn could do both simple and detailed work, but not "work that is consistent with executive functioning or complex."   (Tr. 69).   He could work satisfactorily with supervisors and coworkers, and he experienced 50% capacity to work with the public.   Under those circumstances, Raburn could respond to workplace changes. (*Id.*).   Dr. Strahl acknowledged the importance of a longitudinal relationship with the patient when a doctor offers an opinion about the patient's functional abilities.   (Tr. 71-72).   He also suggested the possibility of engaging a consultative examiner because Dr. Bentley's office records were limited and sometimes illegible.   (Tr. 67, 73).

The ALJ did not heed Dr. Strahl's suggestion to engage a consultative examiner. The ALJ afforded no significant weight to Dr. Bentley's statement that Raburn could not function in any job setting because that statement constituted an administrative finding instead of a medical opinion.   Raburn did not raise a specific challenge to that finding, which finds support in applicable law:

> According to 20 C.F.R. § 404.1527(d), the determination of whether an individual is disabled is reserved to the Commissioner, and no special

> significance will be given to an opinion on issues reserved to the
> Commissioner.   Section (d)(2) provides that although the Commissioner
> will consider opinions from medical sources on issues such as the RFC
> and the application of vocational factors, the final responsibility for
> deciding those issues is reserved to the Commissioner.

*Pate v. Comm'r, Soc. Sec. Admin.*, 678 F. App'x 833, 834 (11th Cir. 2017).   That is, "the

task of determining a claimant's . . . ability to work is within the province of the ALJ,

not of doctors." *Robinson v. Astrue*, 365 F. App'x 993, 999 (11th Cir. 2010).

The ALJ also afforded no weight to the opinions Dr. Bentley stated on the Medical

Source Opinion Form because those opinions were "inconsistent with what the other

medical providers observed."   (Tr. 21).   He further stated:

> The doctor's treatment notes do not reflect that he ever talked to
> [Raburn] about his ability to work.   There was no testing and it was prepared
> based upon the subjective statements of [Raburn] where Dr. Bentley
> accepted without question [Raburn's] statements.   However, his treatment
> notes, which lack even cursory objective tests, do not support limitations to
> the subjective statements of [Raburn].   This check form assessment is not a
> medical opinion, but instead an opinion on residual functional capacity as
> stated by [Raburn]'s attorney, an issue reserved to the Commissioner.   His
> opinion differed from that of the other examining physicians and of a state
> agency medical doctor who is familiar with the rules and regulations as well
> as the definitions of limitations.   He failed to provide medical findings that
> supported his assessment.   Dr. Bentley responded to this check form at the
> request of [Raburn]'s attorney rather than in the course of treatment, and this
> form is not part of his medical records.   Cumulatively, these reasons explain
> why the undersigned gives little weight to Dr. Bentley's "opinions."   These
> opinions offer little more than a conclusory and speculative responses are
> unsupported [sic] by the medical evidence.   As to missing days from work
> or the need for excessive breaks if [Raburn] were to return to work is pure
> speculation of a possible future limitation. [sic]
>
> Moreover, Dr. Bentley's own observations of [Raburn] contradicts
> [sic] these extreme findings.   Dr. Bentley consistently noted that [Raburn]

14

was dressed "neat," was "cooperative," his speech was "clear," his thought process was "coherent," his judgment and insight were "good," [and] he was oriented "x4." . . . . Dr. Bentley also observed that [Raburn] did not have any delusions, hallucinations, paranoia, grandiose thoughts, suicidal ideations, and homicidal ideations. . . . Therefore, the undersigned gives little weight to the opinions of Dr. Bentley and no weight to the check form residual functional capacity.

(Tr. 23).

Contrastingly, the ALJ characterized Dr. Strahl's medical expert testimony as consistent with the medical evidence, and he "considered [Dr. Strahl's] opinion with the other records and findings to determine [Raburn's] residual functional capacity." (Tr. 24). Even though the ALJ did not specifically state the weight he afforded to Dr. Strahl's testimony, the ALJ's comment that he considered Dr. Strahl's testimony to construct Raburn's residual functional capacity indicates he afforded it significant weight.

The ALJ satisfied his obligation to articulate detailed reasons for rejecting Dr. Bentley's opinions and affording more weight to Dr. Strahl's testimony. He permissibly relied on the conclusory nature of Dr. Bentley's opinions, the lack of support in Dr. Bentley's own medical records, and the inconsistency between Dr. Bentley's opinions and those of other medical providers. *See Phillips*, 357 F.3d at 1240 (citing *Lewis*, 125 F.3d at 1440).

The ALJ also properly assessed the "check-box" nature of Dr. Bentley's assessment. Social Security regulations state that "[t]he better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion." *See* 20 C.F.R. §

404.1527(c)(3).  Even so, the Eleventh Circuit recently clarified that an ALJ should not discount a physician's opinion simply because he checked boxes on a pre-prepared form. *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1262 (11th Cir. 2019).  Rather, an ALJ should interpret treating physicians' "answers to the questionnaires in light of their treatment notes." *Id.*  Here, the ALJ compared Dr. Bentley's form responses to his treatment notes, and he attempted to elicit further explanation for Dr. Bentley's opinions by submitting interrogatories.  When Dr. Bentley declined to directly respond to those interrogatories, the ALJ evaluated the letter Dr. Bentley drafted and engaged Dr. Strahl to testify as a medical expert during the administrative hearing.

Substantial record evidence also supports the ALJ's decisions.  On an intake form dated May 18, 2016, Dr. Bentley described Raburn's appearance, psychomotor functions, and affect as "appropriate."  Raburn demonstrated moderate anxiety, depression, and guilt; full orientation as to time, place, and person; adequate insight; logical thoughts; satisfactory attention span; undisturbed memory; concrete speech; and no delusions, hallucinations, homicidal ideations, suicidal ideations, obsessions, or compulsions.  (Tr. 688).  As the ALJ stated, during 14 office visits from May 31, 2016 to October 11, 2017, Dr. Bentley consistently noted neat dress, cooperative demeanor, good eye contact, clear speech, euthymic affect, coherent thought processes, good insight and judgment, no memory deficits, and full orientation, with the following exceptions:  on January 24, 2017, Raburn demonstrated dysphoric affect; on June 29, July 20, and October 11, 2017, he

16

demonstrated constricted affect; and on August 21 and September 21, 2017, he demonstrated flat affect.     (Tr. 690-94, 754, 887-89, 944-48).

Dr. Bentley's descriptions of Raburn's mood varied.    On May 31, 2016, Dr. Bentley noted "depressed" mood.  (Tr. 690).   On June 14, 2016, he noted "swings" in mood. (Tr. 691).   On June 28, 2016, he noted "good" mood.   (Tr. 692).   On July 28, 2016, he noted "pretty good" mood.   (Tr. 693).   On October 24, 2016, he noted "good" mood at times, and "fair" mood at other times.   (Tr. 754).   On January 24, 2017, he noted "depressed" mood.   (Tr. 887).   On February 7, 2017, and April 6, 2017, he noted "good" mood.   (Tr. 888-89).   On June 29, 2017, he noted "not good" mood.   (Tr. 944).   On July 20, 2017, he noted "a little better" mood.   (Tr. 945).   On August 21, 2017, he noted "fair" mood.   (Tr. 946).   On August 25, 2017, he noted "ok" and "good" mood.   (Tr. 694). On September 21, 2017, he noted "depressed" mood.   (Tr. 947).   On October 11, 2017, he noted "better" mood.   (Tr. 948).   As the ALJ observed, Dr. Bentley's records do not contain any objective test results.

Records from other medical professionals also support the ALJ's findings.   During February 15 and March 21, 2016, visits to the Heart Health Center, Raburn reported no psychological problems, and Dr. Ghassan Abusaid noted normal affect upon examination. (Tr. 667-74).   On December 26, 2016, Raburn reported no depression or anxiety to Dr. Brent Boyett, his primary care provider, and the doctor noted Raburn displayed pleasant mood and affect.   (Tr. 745).

On January 9, 2017, Dr. Boyett conducted a depression screening.   Raburn denied losing interest or pleasure in doing things, or feeling down, depressed, or helpless.   Dr. Boyett assessed a 15% chance of Raburn experiencing depression.   Dr. Boyett described Raburn's anxiety as stable.   (Tr. 746).   On May 8, 2017, Dr. Boyett noted Raburn lost interest in activities and felt depressed, down, and hopeless several days during the last two weeks.   However, Dr. Boyett noted Raburn's medication controlled his depression.   (Tr. 891).

During an admission to North Mississippi Medical Center – Tupelo on January 10, 2017, Raburn did not report symptoms of anxiety or depression.   (Tr. 841).   During an admission to North Mississippi Medical Center – Hamilton on January 26, 2017, the physical examination reflected normal psychiatric findings, and Raburn displayed full orientation with normal affect. (Tr. 780, 789, 799, 806).

The opinions of the state agency psychologist also support the ALJ's decision.

> [T]he opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist.

SSR 96-6p, 1996 WL 374180, *2 (July 2, 1996).   As stated in *Duncan v. Berryhill*, No. 3:15-cv-02164-LSC, 2017 WL 3969578 (N.D. Ala. Sept. 8, 2017):

18

> [M]edical consultants or medical experts are highly qualified medical
> specialists who are experts in the Social Security disability programs, and
> their opinions may be entitled to great weight if the evidence supports
> their opinions.   *See* 20 C.F.R. §[§ 404.1527(e), 404.1513a]; SSR 96-6p.
> Indeed, a medical expert's opinion may be entitled to greater weight than
> the opinions of treating or examining sources in appropriate
> circumstances, such as when the medical expert has reviewed the
> complete case record.   *See* SSR 96-6p.   In short, an ALJ "may reject the
> opinion of any physician when the evidence supports a contrary
> conclusion."  *McCloud v. Barnhart*, 166 Fed. Appx. 410, 418-19 (11th Cir.
> 2006) (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983)).

*Id.* at *4.

   Kirstin J. Bailey, Ph.D., reviewed Raburn's records for the stage agency on

September 8, 2016.   She concluded Raburn suffered no understanding and memory

limitations, and he could understand and remember both simple and detailed instructions.

He experienced no significant limitation of his abilities to carry out short and simple

instructions, perform activities within a schedule, maintain regular attendance, be punctual

within customary tolerances, sustain an ordinary routine without special supervision, work

in coordination with or in proximity to others without being distracted by them, and make

simple work-related decisions.   He experienced moderate limitation of his abilities to carry

out detailed instructions, maintain attention and concentration for extended periods,

complete a normal workday and workweek without interruptions from psychologically

based symptoms, and perform at a consistent pace without an unreasonable number and

length of rest periods.   (Tr. 119-20).

   Dr. Bailey declared further:

> [Raburn] should be able to concentrate and attend to familiar tasks
> for extended periods and will need all customary rests and breaks.   [Raburn]
> should be able to complete an ordinary routine without additional
> supervision.   [Raburn] could tolerate ordinary work pressures.   [Raburn]
> would benefit from a familiar work routine but should avoid excessive work
> loads, quick decision making, and multiple demands.

(Tr. 120).   Raburn did not suffer any social interaction limitations.   He experienced

moderate limitation of his abilities to respond appropriately to changes in the work setting,

set realistic goals, and make plans independently of others.   He experienced no significant

limitation of his abilities to travel in unfamiliar places, use public transportation, and be

aware of normal hazards and take appropriate precautions.   He could adapt to infrequent,

well-explained changes, but he would need help with long-term planning and goal setting.

(Tr. 120-21).

The ALJ afforded Dr. Bailey's findings only "some" weight, because some of her

assessments lacked sufficient specificity to support a residual functional capacity finding.

In fact, the ALJ ultimately assessed an even more restrictive residual functional capacity

than Dr. Bailey recommended.   For example, while Dr. Bailey stated Raburn experienced

no significant social limitations, the ALJ found Raburn could tolerate only occasional

contact with co-workers, supervisors, and the general public.   (Tr. 19-20).   Thus, even

though the ALJ did not fully credit Dr. Bailey's assessment, that assessment still provides

support for the ALJ's residual functional capacity finding.

Raburn asserts the ALJ should have discredited Dr. Bailey's assessment as

incomplete because Dr. Bailey did not have the benefit of any medical records dated after

September 2016.   However, that statement holds true for any opinion from a state agency physician, as such physicians always assess claimants during the earliest stages of the administrative process.   Despite that fact, relevant authority allows the ALJ to give weight to state agency physician opinions when those opinions find support in the remainder of the medical evidence, including evidence gathered after the state agency physician's review. *See* SSR 96-6p, 1996 WL 374180, *2; *Duncan*, 2017 WL 3969578, at *4.   The medical record, as explicated above, supported the ALJ's decisions to give some weight to Dr. Bailey's opinions, and to impose even more restrictions than Dr. Bailey imposed.

Moreover, Dr. Strahl *did* have the benefit of more records when he assessed Raburn's condition during the administrative hearing, so the ALJ did not rely solely upon Dr. Bailey's earlier observations to reject Dr. Bentley's opinions.   The medical record, including Dr. Bentley's own records and Raburn's reports to other treating physicians, supported the ALJ's decision to reject Dr. Bentley's opinion in favor of Dr. Strahl's. Despite Raburn's suggestion, Dr. Strahl's failure to conduct a clinical examination does not, by itself, undermine Dr. Strahl's opinion.   The ALJ followed applicable law when he credited Dr. Strahl's opinion after determining it found support in the medical record as a whole.[3]

As Dr. Strahl suggested, a consultative examination would have provided additional insight, but even without such an examination, the record suffices to support the ALJ's

---

[3] Even though the ALJ did not specifically state the weight he afforded Dr. Strahl's opinions, he clearly gave them more weight than he did Dr. Bentley's opinions.

decision.   Dr. Bentley's handwriting, though not always entirely clear, did not present a complete barrier to understanding his office notes, and the other medical records provided additional insight into Raburn's condition.   *See Castle v. Colvin*, 557 F. App'x 849, 853 (11th Cir. 2014) (quoting *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1269 (11th Cir. 2007)) (The ALJ "'has a duty to develop the record where appropriate but is not required to order a consultative examination as long as the record contains sufficient evidence for the [ALJ] to make an informed decision.'"); *see also* 20 C.F.R. § 404.1519a(b) ("We may purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim.").

Finally, the ALJ permissibly relied on Raburn's daily activities to support his decision to reject Dr. Bentley's opinions.   *See* 20 C.F.R. § 404.1529(c)(3)(i) (stating that an ALJ may consider a claimant's daily activities in evaluating the limiting effects of his impairments).   The ALJ characterized Raburn's daily activities as

> inconsistent with Dr. Bentley stating patients remove themselves from pretty much all social interactions be at work or friends [sic] and staying home predominantly, isolating themselves and he believe [sic] that was a condition of [Raburn].   It also contradicts Dr. Bentley's statement that [Raburn] has racing thoughts, which he felt means very difficult to stay on task, stay oriented, and do tasks and not being able to be productive, as he cannot stay, [sic] focused.   "He was experiencing some of that."   However, [Raburn]'s father notes [Raburn] drives, goes to the Post Office, watches TV, reads, uses the computer, handles money, shops at stores for food and clothing, and can go out alone.   Moreover, as it relates to driving, it is noted that driving an automobile for any distance requires sufficient concentration and mental skills to follow directions, read traffic signs, avoid routine road hazards, as

well as appreciate and evaluate on-coming and same-directional traffic.  It also requires significant physical abilities such as sitting in one place for a period of time, turning the steering wheel, and maneuvering one's body in positions as to see in all directions and angles, while simultaneously operating foot controls.  Performance of activities such as these tends to erode any opinion that the [Raburn] is total disabling lack of concentration [sic].

(Tr. 24).

While Raburn's abilities to shop, drive, run errands, watch television, read, use the computer, and handle money may not directly equate to an ability to perform full-time gainful employment, they did constitute permissible factors for the ALJ to consider in determining the weight to afford Dr. Bentley's opinions.  *See Harrison v. Comm'r of Soc. Sec.,* 569 F. App'x 874, 877 (11th Cir. 2014) (citing *Phillips,* 357 F.3d at 1241) ("[A]n ALJ does not need to give a treating physician's opinion considerable weight if the claimant's own testimony regarding her daily activities contradicts that opinion.").

In summary, the ALJ properly considered Dr. Bentley's opinions.

## II.   The ALJ Properly Considered Raburn's Subjective Complaints and Resulting Limitations

Raburn also argues that the ALJ improperly considered his subjective complaints and resulting limitations.  The court concludes the ALJ properly applied the Eleventh Circuit's standard for evaluating subjective limitations, and substantial evidence supported his decision.

"To establish disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test by showing: '(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b)

23

that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.'"

*Zuba-Ingram v. Comm'r of Soc. Sec.*, 600 F. App'x 650, 656 (11th Cir. 2015) (quoting *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (*per curiam*)).   A claimant's testimony coupled with evidence that meets this standard "is itself sufficient to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citation omitted).

Social Security Ruling ("SSR") 16-3p, effective March 28, 2016, eliminated the use of the term "credibility" as it relates to assessing the claimant's complaints of pain and clarified that the ALJ "will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file." SSR 16-3p, 2016 WL 1119029, *7 (Mar. 16, 2016).   An ALJ rendering findings regarding a claimant's subjective symptoms may consider a variety of factors, including: the claimant's daily activities; symptom location, duration, frequency, and intensity; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; and other factors concerning functional limitations and restrictions due to symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3), (4).

SSR 16-3p further explains that the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent review can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, at *9; *see also Wilson*,

284 F.3d at 1225 (if an ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so.").

Raburn testified during the first administrative hearing that he left his previous job because he could not handle the stress of interacting with others.  He did not think he could do a job that required little interaction with others because any job requirements would cause him too much stress.  (Tr. 84-85).  His medications helped his mental symptoms, but he was "not to the point where [he] used to be."  (Tr. 86).  He rarely gets out of bed and dresses himself because he does not see the point in doing so.  His symptoms did not improve after he quit working.   (Tr. 91).

He testified during the second hearing that general stress and anxiety caused him to quit his previous job.  He did not think he could do any other jobs because he could not maintain any job responsibilities.  He testified he had experienced problems with his supervisors, but he could not provide any examples of those problems.  He had panic attacks at work approximately once a month.  On a bad day, he does not get out of bed, brush his teeth, eat, or do anything else.  Those depressive episodes last a couple of days, and they occur ten to 15 times a month, even with medication.

Raburn also described manic episodes occurring approximately five times a month, and lasting one to two days, when he does not sleep, goes on spending sprees, and experiences racing thoughts.  He cannot predict when he will experience a depressive or manic episode.  He drives approximately ten miles a week, sometimes watches television,

uses the internet an hour a day to read the news and talk to a friend, and shops for frozen food items at the grocery store.   He recently suffered a panic attack in Wal-Mart, and he experiences similar episodes approximately once a month.   (Tr. 49-60).

The ALJ accurately summarized Raburn's hearing testimony.   (Tr. 16-17).   He appropriately applied the Eleventh Circuit's pain standard, finding Raburn suffered medically determinable impairments that could reasonably cause his alleged symptoms, yet determining his statements regarding the intensity, persistence, and limiting effects of those impairments did not comport with the medical and other evidence.   (Tr. 17).

The ALJ also articulated sufficient reasons to support his finding.   He accounted for Raburn's psoriatic arthritis by imposing limitations on his abilities to reach, push, pull, climb, balance, stoop, kneel, crouch, crawl, handle, finger, work around dangerous machinery, drive commercially, and endure exposure to extreme cold and vibrations.   He accounted for Raburn's psychological symptoms by limiting him to remembering and performing simple tasks for two-hour periods, with customary breaks; occasional contact with supervisors, co-workers, and the general public; and infrequent changes in the work environment.

> To the extent that [Raburn] has alleged greater limitations than assessed in this decision, such allegations are inconsistent with the relatively stable medical findings and largely conservative treatment.   The undersigned notes that [Raburn] does have psoriatic arthritis, but this impairment is under control with the Stelara injections.   Moreover, the undersigned notes that [Raburn] has sought treatment for his depression, but he has also reported that it is under control with medication.   Finally, the undersigned observes that [Raburn's] own reported activities of daily living suggest functional

26

> abilities beyond those that he has alleged.   In his function Report, [Raburn]
> stated that he is able to prepare sandwiches and frozen meals for himself on
> a daily basis, he is able to do laundry and iron, and he is able to go shopping,
> to the post office, and to Walmart by himself.   Most notably, despite his
> alleged debilitating depression, [Raburn] was able to work until the third
> quarter of 2016, which suggests his symptoms are not as severe as has been
> alleged, as the evidence does not support a worsening of [Raburn's]
> symptoms around the time he[] stopped working.   Additionally, treatment
> notes from when he was taking medication report that it controlled his
> symptoms . . . .   Such wide-ranging activities are clearly inconsistent with
> the degree of symptoms and limitations that he has alleged.

(Tr. 18).

The record does not support the ALJ's finding about Raburn's work during the

third quarter of 2016.   Raburn earned $13,034.00 during that quarter from the Alabama

Department of Conservation (Tr. 294), but he began receiving disability retirement from

the State effective August 1, 2016.   (Tr. 298).   His retirement payments would explain any

"third quarter" earnings during the months of August and September 2016.   The record

does not contain a clear explanation as to why Raburn received earnings from the State

during July 2016.   Perhaps Raburn accrued sufficient paid sick leave to cover his salary

through July, or perhaps the State voluntarily continued to pay his salary until it approved

his disability retirement.   Whatever the explanation for the July earnings, the record

consistently states Raburn last worked on April 11, 2016.   (Tr. 16, 84, 351).   Thus, the

ALJ erred in finding Raburn's work activity after the alleged disability onset date conflicted

with his allegations of disabling impairments.

27

Despite that error, substantial evidence supports the ALJ's decision as a whole. Raburn has not challenged any of the ALJ's findings regarding his physical abilities. As discussed above, the ALJ properly discredited Dr. Bentley's assessments of disabling mental impairments, properly relied upon the other medical evidence of record in determining Raburn's residual functional capacity, and properly considered Raburn's daily activities. Moreover, as the ALJ stated, Raburn's treatment records reflect that medication controlled Raburn's mental health symptoms (although it did not eliminate them). (Tr. 66-67, 891). All of those facts constitute legitimate considerations in evaluating the consistency of Raburn's allegations with the record as a whole. *See* SSR 16-3p, at *7; 20 C.F.R. §§ 404.1529(c)(3), (4).

Raburn advances general assertions that the ALJ improperly relied only on facts that supported a finding of no disability, while ignoring other facts that would have supported a finding of disability; he failed to consider Raburn's longitudinal treatment history; and he improperly substituted his own opinions for those of Raburn's medical providers. The court disagrees with those conclusory assertions. To the contrary, the ALJ thoroughly considered all of Raburn's medical records, rejected facts for which the record contained no support, and properly evaluated the opinions from Raburn's medical providers. Moreover, the mere presence of depressive and manic symptoms, even if they persist over a number of years, does not warrant a finding of disability because symptoms alone do not

determine a claimant's ability to perform work-related activities.   *Moore,* 405 F.3d at 1213

n.6 (citing *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11ᵗʰ Cir. 1986)).

Raburn offers substantive argument regarding only one of the ALJ's allegedly

erroneous findings:

> In interacting with others, [Raburn] has a moderate limitation. [Raburn] stated in his Function Report that he has become very withdrawn and he has not been able to participate in social activities that require strength and endurance . . . .   He testified that due to his depression, on "bad days" he does not get out of bed for up to two days, and his "bad days" occur 10 to 15 times a month.   However, [Raburn] reported in his Function Report that he socializes daily by chatting online and he does not have any problems getting along with others . . . .   He also indicated that the has never been fired from a job because of problems getting along with other people . . . . Dr. Bentley noted that [Raburn] was "cooperative" during his treatment sessions . . . .   Other treating sources have observed [Raburn] as being "pleasant" . . . .

(Tr. 14-15).

The court observes at the outset that the ALJ made that finding when assessing

whether Raburn satisfied a step three listing requirement, not when evaluating Raburn's

residual functional capacity.   Raburn did not challenge the ALJ's finding regarding his

failure to satisfy a listing; he only challenged the ALJ's residual functional capacity finding.

In addition, Raburn's arguments do not undermine the ALJ's finding.   Raburn

complains that the ALJ relied upon a Function Report that predated the ALJ's decision by

21 months because that report did "not reflect [Raburn's] current ability to interact with

others."   (Doc. 11, at 26-27).   But the ALJ did not rely solely on the Function Report to

gauge Raburn's daily activity level; he also considered Raburn's more recent administrative

29

hearing testimony, which essentially reiterated the activity levels Raburn stated on the Function Report.

Raburn also challenges the ALJ's observation of Raburn's ability to communicate with a friend via the internet because it "does not reflect his ability to engage in face-to-face communication." (*Id.* at 27).   The court agrees internet communication does not necessarily equate to face-to-face communication, but as a form of socialization, it bears at least some relevance to Raburn's ability to relate to others.   In addition, the court disagrees with Raburn's argument that the ALJ should not have considered Dr. Bentley's treatment notes reflecting Raburn's cooperative attitude during treatment sessions.   While cooperating with voluntary mental health treatment might not necessarily equate to cooperation in a workplace environment, Dr. Bentley's observations nonetheless bear at least some relevance to the assessment of Raburn's ability to relate to others.

In summary, Raburn's arguments relate only to his ability to relate to others, and they say nothing of his abilities in other mental functional areas, such as understanding, remembering, and applying information; concentrating, persisting, and maintaining pace; and adapting and managing himself.   Even though Raburn disagrees with how the ALJ treated some of the facts, he has not offered any argument or pointed to any facts that undermine the substantial evidence supporting the ALJ's decision.   The court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ.   *See Winschel*, 631 F.3d at 1178 (holding that the court "may not decide the facts anew,

reweigh the evidence, or substitute [its] judgment" for that of the ALJ); *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011) ("The question is not . . . whether ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it.").

The ALJ properly considered Raburn's complaints of subjective symptoms.

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision. The court will enter a separate final judgment.

**DONE** this 27th day of May, 2020.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE